## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| 1. DR. LESLIE HANNAH, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) |
| 1. NORTHEASTERN STATE UNIVERSITY, <br> 2. DR. BRIAN COWLISHAW, <br> 3. DR. DONNA SHELTON, <br> 4. DR. D. AUDELL SHELBURNE, <br> 5. DR. PHILLIP BRIDGMON, <br> 6. DR. STEVE TURNER, and <br> 7. DR. WILLIAM RUGG | ) Case No.: 14-CV-74-RAW <br> ) ) ) ) ) ) ) ) |
| Defendants. | ) |

## AMENDED COMPLAINT

Why would a university derail the tenure track of an internationally renowned scholar at the behest of a small set of socially dysfunctional professors? Why would the same university undermine the program for which it brought the internationally renowned scholar to the school? In this particular situation, the obvious answer, no matter how bizarre it might be, is racism against an honored Native American. For his *Amended Complaint*, the plaintiff states as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Dr. Leslie Hannah ("Dr. Hannah") is Wolf Clan, a citizen of the Cherokee Nation. He hails from and now lives in northeastern Oklahoma. He is an expert in Native American and American Literature, frequently invited to present on the topics. Among other honors, Dr. Hannah was a 2007 Oxford Fellow and a 2010 Fulbright Scholar. He earned his undergraduate and Master's degrees from Northeastern State University, and his Ph.D. from the University of Oklahoma. Dr. Hannah has taught for several institutions, including the University of

Oklahoma, the University of Nevada, Reno, Johns-Hopkins University, Louisiana State University, Louisiana Technical College, and Kansas State University.

2. Northeastern State University ("NSU") was founded in 1846 as the Cherokee National Female Seminary. This historic link to the Cherokee Nation and Indian Territory makes NSU the oldest institution of higher learning in Oklahoma. On March 6, 1909, the Oklahoma legislature purchased the Female Seminary and created Northeastern State Normal School. Now Oklahoma's fourth-largest public four-year institution – one of six regional institutions governed by the Regional University System of Oklahoma board – NSU serves nearly 9,000 students annually on its campuses in Tahlequah, Muskogee and Broken Arrow.

3. Dr. Brian Cowlishaw ("Dr. Cowlishaw"), at all times relevant hereto, was an English Professor at NSU. He taught in the areas of 18th- and 19th-century British literature, fantasy literature, contemporary American novel, and cultural studies.

4. Dr. Donna S. Shelton ("Dr. Shelton"), at all times relevant hereto, was a Professor of Foreign Language at NSU.

5. Dr. D. Audell Shelburne ("Dr. Shelburne"), at all times relevant hereto, was an English professor at NSU. He replaced Dr. Hannah as the Department Chair.

6. Dr. Phillip Bridgmon ("Dr. Bridgmon"), at all times relevant hereto, was the Dean of the College of Liberal Arts at NSU. Dr. Hannah, Dr. Cowlishaw, Dr. Shelton and Dr. Shelburne were all a part of his charge.

7. Dr. Steve J. Turner ("Dr. Turner"), at all times relevant hereto, was the president of NSU.

8. Dr. William Rugg ("Dr. Rugg"), at all times relevant hereto, was Vice President of Academic Affairs and Provost for NSU.

9. At all times mentioned herein, NSU was an employer within the meaning of Title VII of

the Civil Rights Act of 1964, Title 42 U.S.C. § 2000e(b) and as the term is defined by the Equal Employment Opportunity Commission ("EEOC").

10. This action arises under the Title 42 U.S.C. §§ 1981, 1981a, 1988, and 2000e.

11. This Court has original jurisdiction over the federal claims, 28 U.S.C. §§ 1331 and 1343, and supplemental jurisdiction over the state claims, 28 U.S.C. § 1367, as stated herein.

12. The United States District Court for the Eastern District of Oklahoma is the proper venue for this action pursuant to 28 U.S.C. § 1391 (b)(1) and (b)(2) because this is the District in which the plaintiff resides, where the defendants do business and in which a substantial part of the events or omissions giving rise to the claims occurred.

13. Although this *Amended Complaint* is divided into sections, it is intended to be read as a whole, with each part incorporating all others.

## STATEMENT OF FACTS RELEVANT TO ALL CLAIMS

14. Dr. Hannah was an assistant dean and a tenured associate professor of English at Kansas State University when NSU approached him about coming to Tahlequah to follow a dream. He was recruited to head the Cherokee Studies and Language programs at NSU.

15. While at Kansas State, Dr. Hannah had dedicated himself to increasing the Native American enrollment at that university. He actively recruited Native students both who would have otherwise gone to college elsewhere and those who might have avoided college altogether but for Dr. Hannah's inspirational and motivational recruiting efforts.

16. NSU approached Dr. Hannah, in significant part, because of his reputation as a pioneer in the Native American studies movement. Earlier in his career, Dr. Hannah had been a part of a select and determined group of Native American scholars and leaders – a group that included international legend, Wilma Mankiller – who wrote a plan for increasing the role of Native

American studies in higher education. Specifically, Mankiller and Dr. Hannah wanted NSU to be a premiere institution for Native American studies, leading by example an expansion of indigenous studies to improve the global perspective on learning about native peoples.

17. NSU could not afford to pay Dr. Hannah commensurate with his salary as a K-State assistant dean. So, Dr. Hannah had to agree to a reduction in pay – and to walk away from a tenured position – to come to NSU. Although Dr. Hannah was not coming to NSU for the money, he negotiated a rate of pay that would enable him to support his family and pursue his personal mandate to expand Native American studies.

18. As he was quoted in 2011 in the Cherokee Phoenix regarding his position, Dr. Hannah said, "I make a distinct difference between jobs and careers. A job is something one does for a check. A career is something one does for life and these Cherokee language and culture courses change lives and create lifelong learners who in turn become life changers."

19. As further enticement to his recruitment, NSU offered Dr. Hannah an advance 3 years toward tenure.

20. Soon after accepting the Cherokee studies position at NSU, Dr. Hannah was promoted within the system to department head. It was at this point that his employment conditions took a turn for the worse.

21. Dr. Cowlishaw, as Dr. Hannah later discovered, believed that he should have been given the department head position rather than Dr. Hannah. It is more likely that Dr. Cowlishaw was passed over for the department head position due his difficult personality, by most accounts.

22. Dr. Cowlishaw then built a small coalition including his wife, who was also a professor in the same department at NSU, and Dr. Shelton, who were opposed to Dr. Hannah.

23. Racist remarks were the immediate response to the anger Dr. Cowlishaw, Dr. Shelton and

their crew incited. Motivated by his malice, Dr. Cowlishaw and Dr. Shelton began making offensive comments in e-mails and social media. They also participated in and egged on conversations where colleagues and students likewise made racial remarks.

24. These racial remarks they stated and encouraged included statements about American Indians, such as referring to Dr. Hannah as "that f#*king Indian", hoping that Dr. Hannah would be "eaten by wolves", derogatorily suggesting that he was "weaving baskets" and that Dr. Hannah participated in Native legendary "dark forces," etc.

25. Dr. Hannah, not caring for having his heritage ridiculed, made an official complaint through the appropriate university channels repeatedly.

26. Astonishingly, NSU's response was not to bring the racism to a stop. Instead, in November of 2012, NSU reprimanded Dr. Hannah for accusing colleagues of racism and sexism.

27. Eventually, Dr. Hannah stepped down as chair and NSU replaced him with Dr. Shelburne. In the 2013 spring semester, Dr. Hannah taught a class on Cherokee Legal History, but was not given credit for teaching it. He was not paid for teaching that class. Dr. Shelburne, a white man, was given credit – and paid – instead. The reason given for not allowing Dr. Hannah to receive credit for teaching the class for which he wasn't paid was that his workload was deemed to be higher than the target of 9 hours.

28. Dr. Shelburne, though happy to take his unearned money for a Native class, also told Dr. Hannah that Dr. Shelburne did not see the value in Native classes. Dr. Shelburne then used his newfound power and proceeded to cut several Native classes.

29. When Dr. Bridgmon became the Dean over Dr. Hannah's college, Dr. Bridgmon then found a way to deter the funding from the Cherokee Nation over which Dr. Hannah been placed as a final authority. He diverted the funds then away from Native programs. Dr. Bridgmon's

funding scam and lack of response to the ongoing racial attacks further exacerbated Dr. Hannah's grief.

30. Dr. Bridgmon recommended that Dr. Hannah be suspended. Dr. Turner then approved the suspension, as is required by the faculty handbook, and Dr. Rugg issued the letter to Dr. Hannah suspending him. The letter held the promise of termination at the end of the suspension.

31. Later in the spring, in April 2013, Dr. Hannah was denied tenure when three colleagues, all believed to be white, who were known to have made discriminatory remarks against Dr. Hannah and Native American students, were allowed to vote on his tenure.

32. Notably, three others voted in favor of Dr. Hannah receiving tenure. Dr. Hannah's tenure portfolio is exceptionally impressive. As described above, he was named a Fulbright Scholar while a member of the faculty at NSU. His many accolades, however, were not enough to overcome the racial bias he faced.

33. Dr. Hannah had asked the administration, specifically, to remove the members of his tenure committee whom had made the racist remarks about him. He also asked to remove those who were tightly associated with the members who had shown a racial bias against Dr. Hannah. NSU, however, did not remove the persons as requested, resulting in the spilt vote as described, right down racial lines.

34. Originally, Dr. Shelburne had voted to grant Dr. Hannah tenure. However, Dr. Bridgmon destroyed Dr. Shelburne's pro-tenure recommendation – right in front of Dr. Hannah – and replaced it with a no-tenure recommendation that he ordered Dr. Shelburne to write instead.

35. As a result, Dr. Hannah was informed that 2013-2014 would be his last year of employment. However, he was immediately placed on administrative leave with pay for the next year. He was disallowed any contact with campus, any staff or students. To add the most

unnecessary insult and embarrassment, Dr. Hannah was then escorted off campus by armed campus police officers.

36. At the same time, Dr. Shelburne, white, was given tenure six years early.

37. Dr. Turner, again, had to approve the actions and Dr. Rugg issued the actual dismissal paperwork. No reason was given for allowing individuals who were known to have made racial remarks about Dr. Hannah to vote on the future of his career. The reason given for ending his employment was that he had reached the limit of Associate status without receiving tenure. No reason was given for allowing credit and tenure early to a white professor with a less impressive portfolio over Dr. Hannah.

## COUNT I: VIOLATION OF 42 U.S.C. § 1981

38. The defendants' actions were discriminatory as to the plaintiff. The defendants unfairly treated and ultimately derailed the plaintiff's tenure track, at least in part because of his race.

39. The defendants' actions as described herein interfered with the plaintiff's rights in the making, performance, modification, and termination of contacts, and the enjoyment of all benefits, privileges, terms, and conditions of his contractual relationships.

40. As a result of the defendants' actions, the plaintiff has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which he should be compensated.

41. The defendants have engaged in intentional discrimination and have done so with malice or reckless indifference to the federally protected rights of the plaintiff.

## COUNT II: GROSS NEGLIGENCE

42. The defendants owed the plaintiff a duty of care during the plaintiff's employment period

with the defendants, including the duty to avoid inflicting upon him emotional distress by the manner in which the defendants operated its business and in the manner of continuing or discontinuing the plaintiff's employment.

43. Throughout his employment with the defendants, the plaintiff was confronted with the defendants' improper business practices, including the violation of statutes.

44. As a result of the defendants' breach of its duty of care to the plaintiff, the plaintiff suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which he should be compensated.

45. The defendants' actions were reckless, entitling the plaintiff to punitive damages.

## COUNT III: OKLAHOMA CONSTITUTIONAL VIOLATION

46. The acts and conduct of the defendants deprived the plaintiff of his rights, guarantees, and privileges under the Oklahoma Constitution, Art. 2, § 2 in that the defendants were responsible for the violation of the plaintiff's fundamental right identified as follows: "All persons have the inherent right to life, liberty, the pursuit of happiness, and the enjoyment of the gains of their own industry."

47. All actors on the NSU staff who were active or complicit in the allegations set forth herein were working within the scope of their employment for NSU and under color of state law. In an action pursuant to the Okla. Const. art. 2, § 2, *respondeat superior* applies to hold NSU liable for the actions of their employees where those employees are acting within the scope of their employment.

## COUNT IV: TORTIOUS INTERFERENCE WITH CONTRACT

48. Presently, Oklahoma recognizes a tortious interference claim with a contractual or

business relationship if the plaintiff can prove (1) the interference was with an existing contractual or business right; (2) such interference was malicious and wrongful; (3) the interference was neither justified, privileged nor excusable; and (4) the interference proximately caused damage. Additionally, the claim is viable only if the interferor is not a party to the contract or business relationship.

## COUNT V: BREACH OF CONTRACT

49. Although the plaintiff did not actually begin working at NSU until January of 2010, the plaintiff and NSU entered into contracts – some implied and unilateral – on July 29, 2009, whereby the defendant's personnel manuals and other mandatory employment documents acted as offers for unilateral contracts accepted by the plaintiff's actions to continue working for NSU – others written and explicit.

50. NSU breached the contracts – implied and explicit – by the manner of operating the universtiy and in the manner of continuing or discontinuing the plaintiff's employment in contravention of the contracts.

51. The plaintiff has performed all conditions precedent to recover under the contracts and has not excused the defendants' breaches.

52. As a result of the defendant's breaches of the contracts, the plaintiff has sustained damages including but not limited to the amount of lost earnings and employment benefits and the amount of damages for mental and emotional distress or anguish.

## COUNT VI: RACIAL DISCRIMINATION IN VIOLATION OF TITLE VII

53. The defendant's actions described herein were intentional and demonstrate differing employment standards for similarly situtuated, non-minority employees and Dr. Hannah, who is a member of a protected class. Such actions and standards created a hostile work environment

and were adverse to Dr. Hannah's employment situation and status.

54. Dr. Hannah's termination was without sufficient justification and grossly disproportiant to any perceived misconduct. The defendant unfairly treated and ultimately terminated Dr. Hannah, at least in part because of his race. Such adverse employment actions were in violation of the Civil Rights Act, 42 U.S.C. § 2000e-2.

55. The actions and conditions to which the plaintiff was subjected in his employment as described herein was unwelcome, hateful in nature and motivated, at least in part, by his race.

56. The complained of actions and conditions affected a term, condition, or privilege of his employment.

57. NSU knew or should have known of the harassment and failed to take prompt remedial action. NSU failed to exercise reasonable care to prevent and correct the offending behavior, even when the victim reasonably took advantage of the preventive or corrective opportunities that the employer provided.

58. Such actions and conditions were in violation of the Civil Rights Act.

59. As a result of the defendant's actions, Dr. Hannah has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which he should be compensated.

## COUNT VII: RETALIATION FOR EXERCISE OF RIGHTS

60. The plaintiff was engaged in activity protected by the Civil Rights Act when he was complaining, either formally or otherwise, about discriminatory treatment and actions in the workplace.

61. NSU knew of the plaintiff's exercise of his civil rights and, thereafter, took an

employment action adverse to the plaintiff as described herein.

62. NSU took adverse employment actions against the plaintiff in response to his excersice of his rights as described herein.

63. Such retaliation was in violation of the Civil Rights Act.

64. As a result of NSU's actions, the plaintiff has suffered irreparable injuries, including but not limited to loss of pay, benefits and other economic losses, emotional pain and suffering, mental anguish, humiliation, embarrassment, personal indignity and other intangible injuries for all of which he should be compensated.

**PRAYER FOR RELIEF**

WHEREFORE, the plaintiff prays that, after a trial before a jury, this Court award:

A. Judgment for the plaintiff against the defendants for actual and punitive damages for violation of the Title 42 U.S.C. §§ 1981 and 1981a;

B. Judgment for the plaintiff against the defendants for actual and punitive damages for the defendants' gross negligence;

C. Judgment for the plaintiff against the defendants for actual and punitive damages for the defendants' act of in contravention of Oklahoma's Constitution;

D. Judgment for the plaintiff against the defendants for actual and punitive damages for tortious interference with contract;

E. Judgment for the plaintiff against NSU for actual and punitive damages for NSU's breach of contract;

F. Judgment for the plaintiff against NSU for racial discrimination in violation of the Civil Rights Act;

G. Judgment for the plaintiff against NSU for retaliating against the plaintiff in violation of

the Civil Rights Act;

H.  Judgment for the plaintiff against the defendants for the costs of litigation, including a reasonable attorney's fee;

I.  Any and all other relief as this Court deems appropriate according to equity, justice and the evidence presented.

**ATTORNEY'S LIEN CLAIMED**
**JURY TRIAL DEMANDED**

                                        Respectfully submitted,

                                        /s/ Anthony L. Allen
                                        Anthony L. Allen    OBA# 19738
                                        ALLEN & WISNER
                                        101 W. Broadway
                                        Muskogee, Oklahoma 74401
                                        918.683.5291
                                        918.683.3397 fax
                                        anthony@oklahomaslawfirm.com

                                        *Attorney for the plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on the 3rd day of July, 2014, I electronically transmitted the foregoing document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to all counsel who have entered an appearance in this action.

/s/ Anthony L. Allen
       Anthony L. Allen