## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

Dr. Leslie Hannah,

   Plaintiff,

v.           Case No. CIV-14-074-RAW

Northeastern State University,
Dr. Brian Cowlishaw,
Dr. Donna Shelton,
Dr. D. Audell Shelburne,
Dr. Phillip Bridgmon,
Dr. Steve Turner,
Dr. William Rugg,

   Defendants.

## ORDER

  Plaintiff originally filed this action in the District Court of Cherokee County, State of

Oklahoma, on January 10, 2014. Defendants timely removed the action to this court on February

27, 2014. Plaintiff filed his Amended Complaint on July 3, 2014. Now before the court is

Defendants' motion for summary judgment [Docket No. 33].

## CLAIMS

  In his Amended Complaint, Plaintiff brings the following claims: (I) violation of 42

U.S.C. § 1981 against the individual Defendants[1]; (II) gross negligence against all Defendants;

(III) Oklahoma constitutional violation against Northeastern State University (hereinafter

"NSU"); (IV) tortious interference with contract against the individual Defendants; (V) breach of

---

[1]In his response to the motion for summary judgment, Plaintiff agrees that NSU is entitled
to Eleventh Amendment immunity from the § 1981 claims.

contract against NSU; (VI) racial discrimination in violation of Title VII against NSU[2]; and (VII) retaliation for exercise of rights against NSU.

**UNDISPUTED MATERIAL FACTS**

On July 23, 2009, Dr. Hannah was hired as an Associate Professor of English in the Languages and Literature Department to begin on January 13, 2010. Dr. Hannah was to promote the English and Cherokee programs. He was given three years toward tenure credit. Dr. Bridget Cowlishaw, a tenured professor at NSU at the time and wife of Defendant Dr. Brian Cowlishaw, assisted in the hiring of Dr. Hannah.

Shortly after he was hired, Dr. Hannah was appointed Chair of the Language and Literature Department. Docket No. 33, Exh. 2, p. 146 (Dr. Brian Cowlishaw's Affidavit), Docket No. 33, Exh. 3, pp. 16-17 (Dr. Hannah's Deposition). Dr. Brian Cowlishaw had served as Assistant Chair, but had resigned his position in February 2009. Because both Dr. Brian Cowlishaw and Dr. Bridget Cowlishaw worked in the Languages and Literature Department at NSU, the nepotism policy prevented either of them from serving as Chair of the Department. Docket No. 41, Exh. 2, p. 2 (Dr. Terri Baker's Affidavit).

During this time, Dr. Brian Cowlishaw posted on Facebook: "Brian Hammer Cowlishaw / salutes in NSU's direction / Good luck with that, then! [translation: I won't be entering the 'election' for department chair, because what I offer, no one wants] Good luck! / salute!" Then in response to a comment, he wrote: "There will be an 'election' the first week of February. They're making a f*cking indian chair." Docket No. 41, Ex. 3, p. 1 (Facebook excerpts).

---

[2]Within this count, Plaintiff also states that Defendants' actions created a hostile work environment.

In July 2010, Dr. Hannah scheduled an August outdoor Department meeting by the river. Dr. Brian Cowlishaw, Dr. Bridget Cowlishaw and Dr. Donna Shelton aired their disagreement with the venue through posts on Facebook. Several disparaging comments were made, including those that follow. On July 27, in response to a post by Dr. Bridget Cowlishaw about not looking forward to the beginning of the academic year, Dr. Shelton wrote: "Wonder if they sell body armor for use under regalia..." Docket No. 33, Exh. 2, p. 95 (Facebook excerpts). On July 28, in response to a post by Dr. Brian Cowlishaw about the camping trip, Dr. Bridget Cowlishaw wrote: "Nah, our chair will bring all the handbaskets we need. He's probably woven them himself." Docket No. 33, Exh. 2, p. 91 (Facebook excerpts). In response to a post about whether anyone attended, Dr. Bridget Cowlishaw wrote: "Maybe they were all eaten by wolves." Docket No. 33, Exh. 2, p. 93 (Facebook excerpts).

Dr. Hannah reported the posts to NSU. NSU found that the "Facebook postings made by Dr. Bridget Cowlishaw, Dr. Brian Cowlishaw and Dr. Donna Shelton are interpretable as racial references." Docket No. 33, Exh. 2, p. 119-22 (NSU Report). NSU also found: "It appears that the remarks were not intended to be racist or threatening at the level of a hate crime but were instead a poor attempt at showing dissatisfaction and mistrust of departmental/college/university administrators and selection processes." Id. Nevertheless, Dr. Brian Cowlishaw, Dr. Bridget Cowlishaw and Dr. Shelton were reprimanded. Id. On September, 14, 2010, NSU and Dr. Bridget Cowlishaw entered a settlement agreement whereby she resigned. Docket No. 33, Exh. 2, p. 127-28.

In January 2011, Dr. Hannah reported to NSU Human Resources: "I think the time has come for me to leave NSU. This seems to be an unsafe place for American Indians. I will be

submitting my resignation directly to Dr. Betz." Docket No. 33, Exh. 2, p. 71 (Email from Dr. Hannah). Dr. Hannah did not resign his position, but he did resign as Department Chair in 2011. Docket No. 33, Exh. 3, p. 66 (Dr. Hannah's Deposition). Dr. Audell Shelburne (hereinafter "Dept. Chair Shelburne") was hired to be the new Department Chair in July of 2011. Docket No. 33, Exh. 2, p. 134 (Dept. Chair Shelburne's Affidavit).

In May and June of 2011, Dr. Hannah sent messages to NSU Human Resources regarding more Facebook posts by Dr. Bridget Cowlishaw and Dr. Brian Cowlishaw. Docket No. 33, Exh. 2, pp. 75-77 (Emails from Dr. Hannah). Dr. Hannah never presented proof of the posts or made a formal complaint about them.

In the fall of 2012, Dr. Hannah submitted his application for tenure and early promotion. Dept. Chair Shelburne forwarded the application to a tenure review Committee. The Committee consisted of seven people, surprisingly including Dr. Brian Cowlishaw and Dr. Shelton. The Committee held two meetings. Dr. Cowlishaw did not participate in the first meeting wherein the Committee discussed the candidates. He did, however, participate in the second meeting wherein the Committee voted. The vote regarding Dr. Hannah was split 3/3 with one abstention. Docket No. 33, Exh. 2, p. 2 (Dean Bridgmon's Affidavit). Dr. Cowlishaw and Dr. Shelton voted to deny Dr. Hannah's tenure application. Dept. Chair Shelburne did not vote as Chair of the tenure Committee and forwarded the vote and portfolio to the Dean. Docket No. 33, Exh. 2, p. 138 (Dept. Chair Shelburne's Affidavit). Dept. Chair Shelburne included a letter with the portfolio summarizing what he thought were Dr. Hannah's strengths and weaknesses, but did not write in favor or against Dr. Hannah's application. Id.

The Dean, Dr. Phillip Bridgmon (hereinafter "Dean Bridgmon"), received Dr. Hannah's

application and votes from the Committee and independently reviewed the application. Dean

Bridgmon denied Dr. Hannah's application. Dean Bridgmon stated that he did not support Dr.

Hannah's application because "he had polarized the Department and displayed hostility toward

other faculty and staff." Docket No. 33, Exh. 2, p. 2 (Dean Bridgmon's Affidavit). Dean

Bridgmon stated that while he was aware of past conflicts in the department, he was "unaware of

the specifics regarding the Facebook postings in 2010, wherein, (sic) Dr. Hannah accused other

faculty and staff of making racial comments." Id. He stated that he was aware of Dr. Hannah's

"false accusation[3] against the Department Chair, Dr. Audell Shelburne." Id. The Provost, Dr.

William Rugg (hereinafter "Provost Rugg"), then reviewed and concurred in the denial of tenure,

followed by the President, Dr. Steve Turner (hereinafter "President Turner"), who also reviewed

and concurred in the denial. Id. at 4.

On April 12, 2013, Dr. Hannah was informed that his application for tenure and early

promotion was denied. Dr. Hannah filed a complaint, appeal or request for grievance with NSU

Human Resources. Docket No. 42, Exh. 5, pp. 28-30 (Provost Rugg's Deposition). Dr. Hannah

does not dispute that he did not bring his appeal to the University Grievance Committee in

adherence to NSU policy. Docket No. 33, Exh. 2, p. 16 (NSU Policy). No grievance

proceedings were held for Dr. Hannah. Thereafter, NSU's Threat Assessment Team met and

decided to place Dr. Hannah on administrative leave with pay for the remainder of his contract.

---

[3]On October 31, 2012, Dr. Hannah sent an email to Dean Bridgmon stating that he wished
to have a "private dialogue" about his tenure application and that he had "reason to believe"
Dept. Chair Shelburne did not forward his tenure application to the Committee. Docket No. 33,
Exh. 2, p. 24 (Email from Dr. Hannah). In this email, Dr. Hannah also suggested that racism
could be involved in the fact that Dept. Chair Shelburne's tenure application was "shot to the
front . . . while the Indians and the women [were] made to wait." Id. He did not, however,
specifically accuse anyone of racism. Id. Dean Bridgmon replied to the email copying Dept.
Chair Shelburne. Docket No. 33, Exh. 2, p. 25 (Email from Dean Bridgmon).

Docket No. 33, Exh. 2, pp. 68-70 (Letters). Dr. Hannah was escorted off campus by campus police. Dr. Hannah's administrative leave began April 29, 2013 and ended May 15, 2014. Id.

**MOTION FOR SUMMARY JUDGMENT**

If Defendants show that there is no genuine dispute as to any material fact and that they are entitled to judgment as a matter of law, the court must grant their summary judgment motion. Fed. R. Civ. P. 56(a). Of course, the court's function is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). In applying the summary judgment standard, the court views the evidence and draws reasonable inferences therefrom in the light most favorable to the nonmoving party – in this case, Plaintiff. Burke v. Utah Transit Auth. & Local 382, 462 F.3d 1253, 1258 (10th Cir. 2006). At this stage, Plaintiff may not rely on mere allegations, but must have set forth, by affidavit or other evidence, specific facts in support of his complaint. Id.

**FEDERAL CLAIMS**

***Title VII Claims against NSU***

"Title VII makes it unlawful 'to discharge any individual, or otherwise to discriminate against any individual with respect to compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin.'" Khalik v. United Air Lines, 671 F.3d 1188, 1192 (10th Cir. 2012)(quoting 42 U.S.C. § 2000e-2(a)(1)). "Title VII also makes it unlawful for an employer to retaliate against an employee 'because []he

6

has opposed any practice made an unlawful employment practice by this subchapter.'" Id. (quoting 42 U.S.C. § 2000e-3(a)).

### *Discrimination*

To prevail on his Title VII discrimination claim, Plaintiff may either: (1) submit direct evidence of discrimination, or (2) follow the burden-shifting framework of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Id. Under McDonnell Douglas, Plaintiff must first prove a *prima facie* case of discrimination by establishing: (1) he is member of a protected class, (2) he suffered an adverse employment action, (3) he was treated less favorably than others not in the protected class. Id. If Plaintiff establishes a *prima facie* case, the burden shifts to NSU "to produce a legitimate, non-discriminatory reason for the adverse employment action." Id. If NSU meets this burden of production, the burden shifts back to Plaintiff to show that NSU's reason was pretext for discrimination. Id.

### *Retaliation*

Similarly to his discrimination claim, to prevail on his Title VII retaliation claim, Plaintiff may either: (1) "directly show that 'retaliatory animus' played a motivating role in the employment decision," or (2) "rely on the three-part McDonnell Douglas burden-shifting approach to show that the employer's proffered reason for termination was merely a pretext." Estate of Bassatt v. School Dist. No. 1 in the City and County of Denver, No. 13-1244, 2014 WL 7399052 at *4 (10th Cir. Dec. 31, 2014).

Under McDonnell Douglas, Plaintiff must first prove a *prima facie* case of retaliation by establishing: "(1) that he engaged in protected opposition to discrimination, (2) that a reasonable employee would have found the challenged action materially adverse, and (3) that a causal connection existed between the protected activity and the materially adverse action." Id. (quoting

Somoza v. University of Denver, 513 F.3d 1206, 1212 (10th Cir. 2008)). If Plaintiff establishes a *prima facie* case, the burden shifts to NSU "to provide a legitimate and facially nondiscriminatory reason for its decision." Id. If NSU satisfies this burden of production, then Plaintiff must establish by a preponderance of the evidence that NSU's reasons were merely pretext for discrimination. Id.

### *Questions of Material Fact as to Plaintiff's Claims of Discrimination and Retaliation*

Whether the court looks to the direct evidence of discrimination and retaliation or the McDonnell Douglas framework, the outcome is the same – there are questions of material fact. Dr. Hannah is a member of a protected class. Dr. Hannah engaged in protected opposition to discrimination. Dr. Hannah suffered an adverse employment action – denial of his tenure and promotion application followed by his termination. A reasonable employee would have found these actions adverse. At the same time Dr. Hannah was denied tenure, Dept. Chair Shelburne, a white man, was granted tenure.

As for the causal connection – after having been reprimanded for making statements NSU determined were interpretable as racist references toward Dr. Hannah, Dr. Cowlishaw and Dr. Shelton participated in the review of and voted on Dr. Hannah's tenure application. Dept. Chair Shelburne, Dean Bridgmon, Provost Rugg and President Turner each approved this arrangement either knowing the circumstances or being willfully ignorant of them. This is sufficient to create a question of material fact for a jury.

Defendants argue that Dr. Cowlishaw's and Dr. Shelton's votes did not influence anyone else's vote and did not determine the outcome of Dr. Hannah's tenure application. The court is not convinced. It is entirely plausible that Dr. Cowlishaw and Dr. Shelton influenced others'

opinions of Dr. Hannah before and during the tenure application process. In fact, Dean Bridgmon showed his own possible animus toward Dr. Hannah when he copied Dept. Chair Shelburne on a reply to a private message from Dr. Hannah about Dept. Chair Shelburne rather than handling it in a private and more professional manner. Whether the Dean held any animosity toward Dr. Hannah and whether it was racially motivated are questions for the jury.

The court is equally unconvinced by Defendants' temporal proximity argument. Two years is not a significant amount of time. It is more than plausible and rather likely that after two years, Dr. Cowlishaw and Dr. Shelton still held some animosity toward Dr. Hannah for his reporting their Facebook posts, which resulted in their reprimands and possibly in the resignation of Dr. Cowlishaw's wife. In fact, there is evidence that the hostility amongst them remained prevalent. Plaintiff made a *prima facie* case for both discrimination and retaliation.

NSU has also met its burden of production. Each Defendant involved offered legitimate, non-discriminatory reasons for the adverse employment actions. Had Dr. Cowlishaw and Dr. Shelton been removed from the tenure application process, this would be a different case. Defendants would be entitled to summary judgment. Their involvement in the review of Dr. Hannah's tenure and promotion application, however, is sufficient evidence of pretext to defeat summary judgment. The summary judgment motion is denied as to the Title VII discrimination and retaliation claims against NSU.

### Hostile Work Environment

While Plaintiff did not include a separate count for a Title VII hostile work environment claim in his Amended Complaint, within Count VI, he stated that Defendants' actions created a hostile work environment. NSU argues that Plaintiff has not established a hostile work

environment.

To prevail on a Title VII hostile work environment claim, Plaintiff must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [his] employment." Pennsylvania State Police v. Suders, 542 U.S. 129 (2004). The court must look to the "totality of the circumstances, and consider such factors as the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliation, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Morris v. City of Colorado Springs, 666 F.3d 654, 664 (10th Cir. 2012).

Dr. Cowlishaw and Dr. Shelton made statements about Dr. Hannah on Facebook that NSU determined were interpretable as racist references. NSU reprimanded them for their insensitivity. Evidence of hostility, whether it was motivated by race or other factors, remained prevalent within the department. Dr. Hannah even resigned his position as Chair. Evidence of hostility remained even after Dr. Hannah resigned as Chair. Then Dr. Cowlishaw and Dr. Shelton voted on Dr. Hannah's tenure application.

NSU argues in its defense that: (1) it exercised reasonable care to prevent and correct promptly any racially harassing behavior, and (2) Plaintiff unreasonably failed to take advantage of any preventative or corrective opportunities provided by NSU or to avoid harm otherwise. Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998).

NSU's initial action of reprimanding Dr. Cowlishaw and Dr. Shelton was reasonable care. NSU did not, however, take appropriate steps to end any remaining hostility, whatever its origin thereafter. Whether any remaining hostility was racially or otherwise motivated is a question of fact for a jury. NSU even allowed the two professors who had expressed what NSU

determined was interpretable as racial animus toward Dr. Hannah vote on his tenure. While Dr. Hannah may not have followed NSU policy to the letter in reporting, he did report frequently to Human Resources. His superiors, including the Provost and the President were aware of his grievances. The summary judgment motion is denied as to the hostile work environment claim as well.

### Section 1981 Discrimination Claims Against Individual Defendants & Qualified Immunity Defense[4]

Plaintiff includes a claim for discrimination in violation of § 1981 against the individual Defendants. The individual Defendants assert qualified immunity. When a defendant asserts qualified immunity in response to a summary judgment motion, the question is decided differently than in an ordinary summary judgment analysis. Vondrak v. City of Las Cruces, 535 F.3d 1198, 1204 (10th Cir. 2008). The burden shifts to the plaintiff, and the court employs a two-part test.[5] The court must determine whether: (1) "the facts that a plaintiff has [shown] make

---

[4]Qualified immunity balances two very important interests – "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231 (2009). Qualified immunity is "an immunity from suit rather than a mere defense to liability . . . it is effectively lost if a case is erroneously permitted to go to trial." Id. (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)).

"Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or those who knowingly violate the law.'" Ashcroft v. al-Kidd, 131 S.Ct. 2074, 2083 (2011). Qualified immunity protection will apply regardless of whether the official's mistake is "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." Pearson, 555 U.S. at 231.

[5]District courts are permitted to exercise "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." Pearson, 555 at 236.

out a violation of a constitutional right," and (2) "the right at issue was clearly established[6] at the time of defendant's alleged misconduct." Brown v. Montoya, 662 F.3d 1152 , 1164 (10th Cir. 2011) (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 268 (1993). See also Pearson, 555 U.S. at 815-16.

Only if a plaintiff first meets this two-part test does the defendant bear the traditional summary judgment burden to show that there are no genuine disputes of material fact and that he or she is entitled to summary judgment as a matter of law. Kock v. City of Del City, 660 F.3d 1228, 1238 (10th Cir. 2011). Plaintiff has met the two-part test. As shown above, Plaintiff has submitted ample evidence to create questions of material fact with regard to whether his clearly established[7] constitutional rights were violated. Accordingly, the court moves to the traditional summary judgment analysis.

As Defendants state, the same formula and elements that are applied to Title VII employment discrimination claims apply to § 1981 employment discrimination claims. Drake v. City of Fort Collins, 927 F.2d 1156, 1162 (10th Cir. 1991). Accordingly, for the same reasons the court denied the motion for summary judgment as to the Title VII claims against NSU,[8] the

---

[6]"In order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Brown v. Montoya, 662 F.3d 1152, 1164 (10th Cir. 2011) (quoting Stearns v. Clarkson, 615 F.3d 1278, 1282 (10th Cir. 2010).

[7]Ramirez v. Department of Corrs., Colo., 222 F.3d 1238, 1243-44 (10th Cir. 2000).

[8]The court again notes: Dr. Brian Cowlishaw and Dr. Donna Shelton, after having been reprimanded for statements NSU determined were interpretable as racist references toward Dr. Hannah, participated in his tenure review process. While the statements and reprimands were two years prior to the tenure review process, the evidence shows the animosity between them continued. Dept. Chair Shelburne, Dean Bridgmon, Provost Rugg and President Turner were all either aware of the situation or willfully ignorant of it and not only acquiesced, but approved the process and denial of Dr. Hannah's tenure. See Murrell v. School Dist. No. 1, Denver, Colo.,

motion is denied as to the § 1981 claims against the individual Defendants.

**STATE LAW CLAIMS**

*Oklahoma Constitutional Claim against NSU*

Plaintiff claims that NSU deprived him of his right under Article 2, section 2 of the Oklahoma Constitution to "the enjoyment of the gains of [his] own industry." NSU maintains that this is a property right and correctly points out that Plaintiff had no property right to tenure. Oklahoma employees are employed "at will" absent "contractual arrangements entitling them to continued employment, such as tenure agreements." Bunger v. University of Okla. Bd. of Regents, 95 F.3d 987, 990 (Okla. 1996). "[U]ntenured professors in Oklahoma do not possess [a] 'legitimate claim of entitlement' to their reappointment absent a specific contractual guarantee to that effect." Id.

Plaintiff argues, however, that the right to the enjoyment of gains of his own industry goes beyond a simple property right. Both parties cite State, ex rel., Whetsel v. Wood, 248 P.2d 612, 615 (Okla. 1952) in support of their positions. In fact, that court held that an Act that "prohibits one who may be fully qualified by years of training and experience from following his chosen craft and forces him to seek some other work or trade, thus depriving him of the fruits of his own industry" violates Article II, section 2 of the Oklahoma Constitution. Id. This did not occur here. Plaintiff was not granted tenure at NSU, but he also was not prevented from following his chosen craft elsewhere. Plaintiff was not prevented from following the occupation for which he had qualified himself by the expenditure of "time and toil." Id. at 614. Plaintiff's

_____

186 F.3d 1238, 1250 (10th Cir. 1999).

13

Oklahoma constitutional violation claim fails.

***Negligence & Breach of Contract Claims against NSU***

Plaintiff includes a claim for "gross negligence" and a claim for breach of contract against NSU. Defendants argue, and Plaintiff does not contest, that Plaintiff does not have the statutory prerequisites necessary for a negligence claim or a breach of contract claim against NSU.

Oklahoma's Governmental Tort Claims Act (hereinafter "GTCA"), 51 Okla. Stat. § 151, et seq., governs claims against the state of Oklahoma and its political subdivisions. While the State, its political subdivisions and its employees acting within the scope of their employment enjoy sovereign immunity pursuant to the Eleventh Amendment to the United States Constitution, Oklahoma waives that immunity "only to the extent and in the manner provided [in the GTCA]." 51 Okla. Stat. § 152.1(B).

The GTCA requires that claims against the state or a political subdivision be presented to the state or the political subdivision for relief including money damages within one year of the loss or be forever barred. 51 Okla. Stat. § 156(A) & (B). The GTCA further provides that a person may not bring an action against the state or a political subdivision unless the claim has been denied in whole or in part by the state or political subdivision and he files the action within 180 days of the denial. 51 Okla. Stat. § 157(A) & (B).

The Oklahoma Supreme Court has stated that compliance with the GTCA's notice provisions are a "condition precedent to suit against a political subdivision." Duncan v. City of Nichols Hills, 913 P.2d 1303, 1307 (Okla. 1996)(citations omitted). Moreover, compliance with the GTCA's notice requirement must be included in the complaint. Willborn v. City of Tulsa, 721 P.2d 803, 805 (Okla. 1985); Girdner v. Board of Comm'rs, 227 P.3d 1111, 1115 (Okla. Civ.

App. 2009).

Plaintiff does not allege in the Petition or in his response to Defendants' motion to dismiss that he presented his claims to the state as required by the GTCA and that they were denied by the state. The court can only conclude that he did not comply with the GTCA's notice requirement. Moreover, his Petition is facially flawed. See Willborn, 721 P.d at 805. The court, therefore, grants Defendants' motion as to the negligence claim and the breach of contract claim against NSU.

***Negligence & Tortious Interference with Contract Claims against Individual Defendants***

Plaintiff also includes a claim for "gross negligence" and a claim for tortious interference with contract against the individual Defendants. Defendants argue that individuals cannot be liable for interfering with a contract while acting in a representative capacity for a party to the contract. In Oklahoma, a person acting in a representative capacity for a party to a contract cannot be held liable for wrongfully interfering with that contract. Voiles v. Santa Fe Minerals, Inc., 911 P.2d 1205, 1210 (Okla. 1996). An employee, however, may be held liable when he or she "acts in bad faith and contrary to the interests of the employer in tampering with a third party's contract with the employer." Martin v. Johnson, 975 P.2d 889, 896-97 (Okla. 1998). Nevertheless, interference without bad faith or simple poor business judgment are not enough to create liability. Id. at 897.

Plaintiff argues that the individual Defendants acted in bad faith and therefore may be held liable. Dr. Cowlishaw and Dr. Shelton, after having been reprimanded for making statements NSU determined were interpretable as racist references toward Dr. Hannah, participated in his tenure review process. Dept. Chair Shelburne, Dean Bridgmon, Provost Rugg

and President Turner each approved this arrangement either knowing the circumstances or being willfully ignorant of them. As the court held above, this creates a question of material fact. A jury could find that this was simple poor businesses judgment or that it was bad faith. The court may not make this determination This is a question of material fact for a jury.

Moreover, if the individual Defendants acted in bad faith, they acted outside the scope of their employment. Pellegrino v. State of Oklahoma ex rel. Cameron Univ., 63 P.3d 535, 537 (Okla. 2003). Accordingly, the motion for summary judgment is denied with regard to the negligence and tortious interference with contract claims against the individual Defendants.

**CONCLUSION**

Defendants' motion for summary judgment [Docket No. 33] is hereby GRANTED in PART and DENIED in PART. Plaintiff's § 1981 claims, Oklahoma constitutional and state law claims against NSU are dismissed. Plaintiff's Title VII claims against NSU remain. Plaintiff's § 1981 claims and state law claims against the individual Defendants also remain.

IT IS SO ORDERED this 5th day of February, 2015.

**Dated this 5th day of February, 2015.**

Ronald A. White
United States District Judge
Eastern District of Oklahoma

16